47 CCPA

**Application of Hans T. F. LUNDBERG and Theodore Zuschlag, Deceased, by Johanna Zuschlag, Administratrix.**

**Patent Appeal No. 6571.**

United States Court of Customs and Patent Appeals.

July 20, 1960.

E. Clarkson Seward, New York City, for appellants.

Clarence W. Moore, Washington, D. C. (D. Kreider, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the affirmance by the Patent Office Board of Appeals of the examiner's rejection of claims 1–11, all of the claims of appellant's application No. 523,784, filed July 22, 1955 for "Apparatus for and Method of Geophysical Exploration."

The application at bar is stated to be a continuation of application No. 2885, filed January 17, 1948 as a division of application No. 561,436, filed November 1, 1944.

Application No. 2885 was before this court with respect to claims 51 and 54–58 thereof, the rejection of which was affirmed in In re Lundberg et al., 244 F.2d 543, 44 CCPA 909 (decided in 1957). Application No. 561,436 was also before this court in In re Lundberg et al., 197 F.2d 336, 39 CCPA 971 (decided in 1952), wherein the rejection of claims 99–116 of that application was affirmed. (The last-mentioned application is said to have matured into Patent No. 2,636,924.)

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of* *Judge O'CONNELL*, pursuant to provisions of Section 294(d), Title 28 United States Code.

The instant application, being filed as a continuation of one which had been prosecuted (as was its parent) through appeal to this court, was treated as "special" and reached its final rejection by the examiner on the second action in less than five months from its filing, following what appellants admitted was an "effective" pendency of over ten years, qualified by the assertion that the claims here are "new claims drawn in accordance with the express permission of the new Patent Act * * * presented for fresh consideration in compliance with the salutary changes made by the new Act for the benefit of inventors."

As is apparent from the fact that the instant application is a "continuation" of No. 2885, the invention *disclosed* in the application here on appeal is the identical invention which was before this court in the second Lundberg et al. case, supra, decided in 1957.

The claimed invention here, as in the former case, relates broadly to aerial geophysical exploration for the purpose of determining, by detection and measurement of anomalies in the earth's magnetic field, the existence, location, outline, and depth of sought for mineral deposits in the earth. All appealed claims except 3 and 5 are directed to apparatus and those two claim a method. Whichever way the invention is defined, it is practiced by carrying through the air above the terrain being examined, means for detecting and measuring a component of the magnetic fields encountered, while automatically stabilizing said means with respect to level and orientation, recording the measurements made, relating them to the terrain, and interpreting the results.

 In the prior appeals we affirmed rejections of the claims as unpatentable over prior art. In the present case claims 1–11 are likewise rejected on prior art but additionally they all stand rejected on the ground of *res judicata* [1] by reason of the later of our two prior decisions, supra. Claims 1–5 (all of those initially presented) were so rejected on the first action, the next and final action so rejected all claims, and the board affirmed this rejection, citing In re Ellis, 86 F.2d 412, 24 CCPA 759. It also affirmed the rejection on prior art. We will consider first the issue involving *res judicata*.

 The starting point is a comparison of what is claimed here *with the relevant claims in the prior case*. If the claimed subject matter is the same, the prior adjudication is binding; if differences appear, then we look to their nature and significance. If the difference is one which would not be obvious to one of ordinary skill in the art, the prior adjudication is certainly not a ground for rejection. But, we repeat, the difference is between the previously adjudicated claims and the appealed claims, not between the present claims and the prior art. We emphasize this in view of appellants' effort to get a *de novo* consideration on the basis of the prior art alone, a contention implicit in the following excerpt from appellants' brief:

> "This last named ground [res judicata] seems to Appellants to be practically moot because, if this Court agrees that some or all of the claims are patentable, the holding of *res adjudicata* [sic] is eliminated; while if all the claims are held to be unpatentable, the said ground is superfluous."

1. In view of the consistent use by the examiner, the board, and the appellants (but not the Patent Office Solicitor) of the expression *res adjudicata*, attention is directed to the following from Black's Law Dictionary, 3rd Ed.:
 *Res adjudicata.* A common but indefensible misspelling of *res judicata.* The latter term designates a point or question or subject-matter which was in controversy or dispute and has been authoritatively and finally settled by the decision of a court. *Res adjudicata* (if there be such a term) could only mean an article or subject of property "awarded to" a given person by the judgment of a court, which might perhaps be the case in replevin and similar actions.

And again:

> " * * * the holding of *res adjudicata* [sic] is subservient to the holding of patentability."

Patentability over prior art is not reconsidered as a virgin problem. On the contrary, the prior decision stands, right or wrong, for all disputed issues there decided, In re Prutton, 204 F.2d 291, 295, 40 CCPA 975, 980, and we determine patentability of the new claim *over the adjudicated claim*, considering prior art, if necessary, only if substantial differences between the claims exist. The public policy which is implemented by this rule is that there shall be an end to litigation, that when one has exhausted the remedies provided by law he shall not be permitted to go through the process all over again. Appellants' brief shows no awareness of this legal principle in repeatedly "urgently requesting" us to review our former holdings and revaluate the references in the light of the new claims.

In cases appealed to this court, or taken to the District of Columbia courts under 35 U.S.C. § 145, involving the *ex parte* prosecution of patent applications what must be borne in mind with respect to *res judicata* is the distinction between claims to different inventions on the one hand and different claims to the same invention on the other. Where different inventions are claimed, *res judicata* does not preclude a new consideration; but where an applicant is merely presenting new claims to the same invention, the patentability of which he has already argued before the court, reconsideration of the issue of patentability is proscribed by the doctrine of *res judicata*.

Turning now to the appealed claims, claim 1 is the apparatus claim on which dependent claims 2 and 6–11 are based and is like claim 4 except for differences which will be pointed out later. Claim 1 reads:

> "1. Apparatus for geophysical exploration from the air *for deter-mining the existence, location, outline and depth of sought for mineral deposits in the earth* comprising, the combination with a maneuverable airplane adapted to transport an operating crew and the hereinafter recited equipment, of means carried thereby for detecting and measuring while in the air with a precision sensitivity capability of one gamma or less at least one component of magnetic fields related to such deposits, operatively connected means for automatically stabilizing said detecting and measuring means in relation to level and orientation for maintaining its detecting and measuring sensitivity regardless of motions of the airplane, and means operatively connected with the detecting and measuring means for automatically and simultaneously making a record of the measurements as they occur." [Emphasis ours.]

Claim 54 of application No. 2885 before us in Lundberg et al., 244 F.2d 543, 544, 44 CCPA 909, supra, reads as follows:

> "54. Apparatus for geophysical exploration from the air comprising, the combination with a maneuverable airplane adapted to transport an operating crew and the hereinafter recited equipment, of a magnetic detecting instrument carried by the airplane and adapted while in the air automatically to receive and respond to with a sensitivity of one gamma or less magnetic effects of earth anomalies related to mineral deposits, a support for said detecting instrument carried by the airplane in operative association with the detecting instrument and adapted automatically to stabilize the latter in relation to level and orientation regardless of motions of the airplane, and a record making device also carried by the airplane in operative association with the detecting instrument and adapted simultaneously to make a record of

the said effects of the said anomalies to which the detecting instrument responds."

It is clear that these two claims define the same combination of airplane, detecting and measuring means, stabilizing means, and recording means albeit the language is changed. The principal difference presented to us by appellants as having significance is the italicized passage in claim 1, it being argued that this is "a definite limitation, rather than a mere introductory preamble, because it directly *specifies the apparatus claimed* which comprises the thereafter recited elements." We are unimpressed by this contention. It is clearly no more than a preamble, is but the *object or purpose of* the apparatus, does not define structure and, as the Patent Office solicitor pointed out, is implicit in the words "for geophysical exploration." It cannot be relied on to differentiate claim 1 from claim 54. Appellants similarly argue about several other less evident changes in verbiage which we have carefully considered but the distinctions are even more tenuous and we see no need to discuss them. The claims speak for themselves. We find the same invention is being claimed in claim 1 as was claimed in claim 54.

Claim 4 differs from claim 1 in omitting the airplane as a positive element of the combination while using the preamble "Apparatus for aerial flight magnetic geophysical exploration for determining" etc. Appellants point to other differences from claim 1, an example being that "this claim refers to 'magnetic fields *indicative* of such deposits' instead of merely saying '*related* to such deposits'." It is clear to us that it is in the same class as claim 1, a claim to the same invention in substance as claim 54 of No. 2885, though broader with respect to the means for achieving "aerial flight" and perhaps somewhat narrower in some other respects.

Claims 3 and 5 are to a method of magnetic geophysical exploration using the apparatus broadly defined in claim 1 and differ from each other much as claims 1 and 4 differ, claim 3 exploring "from an airplane" while claim 5 calls for "aerial flight" exploration. Claim 3 reads:

"3. A method of magnetic geophysical exploration from an airplane for mineral deposits in the earth which includes the following steps: flying through the air above the terrain being explored means for automatically detecting and measuring with a precision sensitivity capability of one gamma or less at least one component of the magnetic field or fields encountered while automatically stabilizing the said detecting and measuring means in relation to level and orientation against motions of the airplane and simultaneously making a record of the measurements; identifying for desired subsequent operations the area or areas indicated by the record as containing a sought for deposit or deposits; and interpreting the record for determining the location, outline and depth of the deposit or deposits."

Claim 55 in the appeal on application No. 2885 reads:

"55. A method of geophysical exploration from a maneuverable airplane which includes the following steps: transporting by such an airplane over an area under investigation an operating crew and magnetic detecting equipment capable of automatically receiving and responding to with a sensitivity of one gamma or less effects of earth anomalies related to mineral deposits, such as changes in the earth's magnetic field or a magnetic field artificially created in the earth; automatically stabilizing said detecting equipment in relation to level and orientation during transportation regardless of motions of the transporting airplane; automatically making a record of the said effects of such anomalies which the detecting equipment receives and to which it responds as it responds thereto; identifying for subsequent examination the ter-

rain indicated by the said received and recorded effects as containing such anomalies; and geophysically interpreting the record thus obtained."

We are unable to see how a reading of these claims can lead to any other conclusion than that they define substantially the same invention. Aside from pointing out that the same arguments apply as those made with respect to claim 1, all appellants do here is point to such immaterial differences as that between identifying the "area" containing a deposit (claim 3) and identifying the "terrain" containing the anomalies (claim 55), asking us to reconsider patentability over the art because of such differences. Appellants have had their day in court on this method and are not entitled to such reconsideration.

Apparatus claims 2 and 6–10 depend from claim 1, adding thereto progressively limitations to a "permeability bridge" as the "detecting and measuring" means recited in claim 1 and various details of that bridge. Claim 2 calls for "a permeability bridge" broadly without further limitation, claim 6 for an "alternating current—direct current permeability bridge" and claims 7–10 depend each from the preceeding claim, adding further details. Claim 7 reads:

"7. Apparatus as defined in claim 6, in which the permeability bridge includes *at least one* pick-up *coil having a core composed of* highly permeable *material* that is extremely sensitive to magnetic variations and resists change in its operative characteristics when exposed to mechanical vibrations and thermic and barometric fluctuations, *such as nichrome.*" [Emphasis ours.]

Claim 51 in application No. 2885, previously adjudicated, reads:

"51. Apparatus as defined in claim 54, in which the detecting instrument is provided with *at least one coil having a core composed of metal* which is not only extremely sensitive to variations in intensity of natural or artificially created magnetic fields but is also strongly resistive to change in its operative characteristics when exposed to mechanical vibrations, thermal variations, or barometric fluctuations, *such as nichrome.*" [Emphasis ours.]

The supporting disclosure behind both of these claims is, of course, identical since we are dealing with a continuing application and is, in part, as follows:

"This detecting or investigating mechanism may be defined as an alternating current—direct current permeability bridge similar to that described in United States patent to Theodore Zuschlag No. 1,896,737, dated February 7, 1933. This instrument or mechanism is based upon a magnetic effect set up in a nichrome wire, or its equivalent, which is used as a core in a coil energized by an alternating current simultaneously exposed to the effects of a direct current generated in a substantially uniform field being investigated.

Zuschlag patent No. 1,896,737 discloses a Wheatstone bridge network for detecting magnetic field fluctuations which occur in the magnetic testing of rails or the like, the bridge containing a pair of coils with ferro-magnetic cores, which the instant as well as the prior application suggests may be nichrome.

Claims 2 and 6 fall with claim 7 since they are simply intermediate claims 1 and 7 in scope. Claims 8, 9 and 10 merely add, successively to claim 7, connection to a source of alternating current for energizing the coil or coils, means for adjusting the field strength affecting the pick-up cores and the independent adjustment thereof. Appellants make no argument as to these last three claims, as distinguished from the others, merely pointing out that they add "more and more details." Perforce, since Zuschlag is relied upon by appellant as the sole support for the specific limitations of the bridge recited in claims 2 and 6–10, Zuschlag is also prior art for these same

limitations. However, one must still decide whether *res judicata* prevents re-examination of the patentability of the combination. Claim 51 in our prior case included, as the detector, a coil having a specific type of core. This is the same coil and core detector which appellant *now recites as merely included in a per-meability bridge circuit*, or a permeability bridge circuit the details of which were known to one skilled in the art. The bridge and single core perform identical functions in the combination, each measuring magnetic field variations in the same manner, any differences in sensitivity apparently depending only on the details of the detector itself and not on the combination. We are therefore of the opinion that *res judicata* is controlling insofar as claims 2 and 6–10 are for the *same invention* as the claims in the prior case (the use of a coil and core detector). Insofar as they differ by merely progressively decreasing in scope by including obvious features shown by Zuschlag, they are hereby held to be unpatentable over the prior adjudicated invention.

Claim 11 depends from claim 1 and reads:

"11. Apparatus as defined in claim 1, in which the detecting and measuring means includes a plurality of magnetrons, a main field coil coaxially surrounding and operatively connected with each magnetron, an auxiliary field coil coaxially positioned with respect to and operatively connected in opposition to each main coil, and a record making device operatively connected with the magnetrons."

The feature of claim 11 is the use of the defined magnetron circuit as the "detecting and measuring" means which is one element of the combination broadly defined in claim 1, including a *plurality* of magnetrons, associated main field coils and an auxiliary field coil related in a particular way to each main coil. The "record making device" would appear to be the "means for automatically and simultaneously making a record" of claim 1 (which has its counterpart in claim 54 of No. 2885) with the requirement that it be "connected with the magnetrons."

In the prior case application No. 2885 also had claims to magnetron circuits as follows:

"57. Apparatus as defined in claim 54, in which the detecting instrument includes *at least one magnetron* together with *a control coil operatively connected thereto* and means for supplying electric current to the control coil. [Emphasis ours.]

"58. Apparatus as defined in claim 57, which also includes an *auxiliary feedback coil* connected in opposition to the control coil." [Emphasis ours.]

Examination of claim 58, including the subject matter of claim 57 on which it is dependent, reveals that it differs from claim 11 in the instant case only as respects the use of a "plurality of magnetrons" as opposed to "at least one" and in the coaxial positioning of the two coils associated with each magnetron. In our opinion on application No. 2885, as to claims 57 and 58 this court said:

"As aforesaid, the 'Physical Review' article discloses the general adaptation of magnetron circuits to the measurement and detection of magnetic fields. Also, we have previously pointed out that the Hull reference fairly suggests the use of a magnetometer of a sensitivity of one gamma for use as the detecting instrument. It would be obvious to one skilled in the art, in view of the foregoing, to substitute a magnetron for the magnetometer detecting instrument of Hull.

\* \* \* \* \* \*

"With reference to claim 58, the board stated that the use of feedback members in electrical circuits is well known. Appellants have failed to question the accuracy of said statement by requesting that it be supported by an affidavit under Patent Office Rule 107, 35 U.S.C.A.Ap-

pendix and did not present any evidence to contradict it. Therefore we are constrained to accept it as true. In re Lewis, 96 F.2d 1009, 25 C.C. P.A., Patents 1273 [37 USPQ 786]. In view of this fact, we fail to see that it would be inventive to use a feedback coil in conjunction with a conventional magnetron coil as broadly recited in claim 58. The rejection of claim 58 is accordingly sustained."

The holdings on these disputed issues were necessary to our finding that the claims in the prior case were unpatentable and *res judicata* precludes a reexamination of those prior holdings.

In Hall's "Physical Review" article (one of the references in both this and the prior case) the magnetron control coil is described as "a solenoid wound around the magnetron," and is also illustrated as coaxial with the magnetron. In positioning the auxiliary as well as the main field coil, one skilled in the art would coaxially position the windings and the magnetron to obtain the proper effect on the electron beam in the magnetron. The use broadly of a "plurality of magnetrons," as called for by claim 11, without limitation as to positioning or specific circuit connections is clearly suggested by the prior art bridge circuits which incorporate a plurality of magnetometers in the various arms of a balanced bridge circuit. Claim 11 is unpatentable because insofar as it would require a reexamination of the identical issues raised in the prior case, because of inclusion of the same subject-matter as the prior claims, *res judicata* controls and insofar as it differs from the claims previously adjudicated we hold that those differences are only such as would be obvious and hence unpatentable.

With respect to appellants' general allegation that they were entitled to have their application passed on according to the law as set forth in the Patent Act of 1952, our review convinces us that the applications have been so treated at all times subsequent to the effective date of that act. The applications formerly before us were certainly so treated in this court. However, we did not always agree with appellants on the construction of various provisions of that act, nor do we now.

The decision of the board is affirmed.

Affirmed.